## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**SARA GREGORY,**

                                       **CASE NO.: 4:21-cv-00423-AW-MAF**

    **Plaintiff,**

**v.**

**AHI HOLDINGS, LLC,**

    **Defendant.**

_____/

### PLAINTIFF'S RESPONSE IN OPPOSITION TO
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Sara Gregory, responds in opposition to Defendant's Motion for Summary Judgment [Doc. 25], and states the following in support of her position.

### PLAINTIFF'S STATEMENT OF DISPUTED FACTS
### MATERIAL TO HER CLAIMS

Plaintiff has an Associate's of Science in Nursing ("ASN"). [Ex. 31, Gregory Dep. 28:16-23]. She graduated with her Registered Nurse degree in 2006. [Ex. 31, Gregory Dep. 29:11-20]. She began her employment with Defendant, AHI Holdings, LLC, at the St. James Health and Rehabilitation Center ("Defendant" or "St. James") on November 14, 2018. [Ex. 31, Gregory Dep. 47:3-11].

Defendant hired Plaintiff as a Unit Supervisor (or Nurse Supervisor) and in that role she reported directly to the Director of Nursing. [Ex. 31, Gregory Dep. 142:23-143:4, 144:16-21, 161:24-162:1]. The floor nurses then reported to Plaintiff.

[Id.]. Tabitha Ray was the DON during Plaintiff's employment. [Ex. 31, Gregory Dep. 126:2-5; Ex. 39, Ray Dep. 8:8-18]. At all times relevant to this action, Shanika Mathieu was the Administrator of the facility and Ray's direct supervisor. [Ex. 39, Ray Dep. 15:11-16; Ex. 41, Mathieu Dep. 6:18-25]. Krystal Anderson was the Human Resources Payroll Coordinator, and she was responsible for all human resources functions at the facility. [Ex. 40, Anderson Dep. 7:22-25].

Unit Supervisors generally worked 8:00am to 4:30pm, Monday through Friday. [Ex. 31, Gregory Dep. 145:7-13]. However, following issues with the night shift and suspicion that some employees may be sleeping or otherwise not performing their duties, Ray asked Plaintiff on approximately twelve occasions to work night shifts and "surprise" the staff to see how they performed. [Ex. 31, Gregory Dep. 149:20-151:22, 155:17-24].

Plaintiff's subordinates testified that she was a good unit supervisor and very "by the books." [Ex. 32, Henderson Dep. 6:3-7:1]. She genuinely cared about her patients and the other employees, and was a very hard worker, often taking over for her staff when they went on breaks to ensure proper patient care. [Id.]. She was also described as "one of the best nurses" staff had ever worked with, including Cleopatra Henderson, who had worked as a CNA for over two decades. [Ex. 32, Henderson Dep. 16:15-18].

Moreover, following Plaintiff's hire, working conditions improved. [Ex. 32, Henderson Dep. 19:7-20:17]. She held her staff accountable, and thus staff began to show up for work on time and fewer employees called out last minute. [Id.]. Because of the improved conditions, employees were actually rewarded for their good work. [Id.].

Kristi Damron, the Social Services Director, described Plaintiff as "task oriented, professional, caring, and knowledgeable." [Ex. 33, Damron Dep. 8:18-24, 9:19-22]. Other nurses, including Wendell Barfield, testified that Plaintiff was "very professional and diligent in her job duties." [Ex. 34, Barfield Dep. 13:13-16]. Simone Doyle testified that Plaintiff was professional, a hard worker, dedicated, and "by the book." [Ex. 35, Doyle Dep. 11:7-12:10]. She further testified that Plaintiff always went above and beyond the call of duty. [Id.].

Conversely, during Plaintiff's time as a Unit Supervisor in or about December 2018 and continuing from there on, another Unit Supervisor, Courtney Shiver, was repeatedly observed engaging in and was accused of sexual abuse and harassment. [Ex. 31, Gregory Dep. 125:24-126:23; Ex. 38, Amalfitano Dep. 38:1-39:1, 42:16-43:15]. Shiver would tell patients that they could "touch her butt" if they would take their medications or otherwise be compliant; she then allowed them to do so. [Ex. 31, Gregory Dep. 134:22-135:21; Ex. 32, Henderson Dep. 18:12-25].

3

In addition to inappropriate conduct with patients, Shiver also groped and pinched Plaintiff as well. [Ex. 31, Gregory Dep. 127:5-128:12 Ex. 32, Henderson Dep. 16:19-17: 23, 18:18-25]. Plaintiff reported the conduct to Ray, as well Mathieu, both verbally and in writing, but Ray brushed it off and indicated that Shiver was just joking around but should know not to behave in that manner. [Id.]. Plaintiff also reported that during that same week, she observed Shiver inappropriately touching a patient. [Ex. 31, Gregory Dep. 132:9-133:7].

Damron also confirmed that Shiver touched her inappropriately. [Ex. 33, Damron Dep. 11:4-14:4]. Damron told Shiver not to touch her again, in front of Ray. [Id.]. Shiver continued her conduct and Ray did nothing to correct the situation. [Id.].

Around this same time, in late November 2018, Ray attempted to get Plaintiff to falsify documents about a wound assessment performed by RN Sheila Reed, to bring about her termination. [Ex. 36, Reed Dep. 24:18-25:11]. Plaintiff refused. [Id.].

In January 2019, Plaintiff reported LPN India Harris for both a poor and unprofessional attitude and for essentially stealing medicine from another patient's emergency drug kit because she was out of a particular medicine and did not want to take the time to locate another source. [Ex. 10; Ex. 31, Gregory Dep. 167:16-168:20]. Plaintiff submitted her written report to Ray. [Id.]. Around this same time, she also reported Ray's hostile conduct, which resulted from Plaintiff's report about Ray asking nurses and other staff members to complete her online English courses

4

for her. [Ex. 31, Gregory Dep. 170:18-23; Ex. 33, Damron Dep. 29:12-25; Ex. 35, Doyle Dep. 10:6-22].

Plaintiff's employment continued without other issues until late April 2019, when her mother fell at her home. [Ex. 11; Ex. 31, Gregory Dep. 171:7-24, 172:6-173:12; Ex. 39, Ray Dep. 26:15-25, 28:22-29:1]. After her mother's accident, Plaintiff sent Ray a test message and ask if there were any full-time day shift nursing positions available, as she required a different schedule to care for her mother at that time. [Id.]. However, Plaintiff asked about the pay difference, as she would only be able to change positions if the reduction in pay was not too significant. [Id.].

Plaintiff hoped to work three twelve-hour shifts, leaving her four days at home to care for her mother. [Ex. 31, Gregory Dep. 178:12-23]. Ray initially told Plaintiff that there was a floor nurse position available. [Ex. 11; Ex. 31, Gregory Dep. 176:4-8, 176:9-22]. However, Plaintiff also promised not to change positions or quit outright until after the JCAHO certification, as she had experience with that process. [Ex. 31, Gregory Dep. 192:2-23].

Plaintiff also requested to split the Unit Supervisor role with Cheree Blevins, as they each needed to work three twelve-hour shifts, and Blevins was already receiving a schedule accommodation with flexed and altered hours. [Ex. 11; Ex. 31, Gregory Dep. 146:4-25, 179:3-180:12]. Shriver was covering Blevins' remaining two days. [Id.]. Ray rejected this request and informed Plaintiff that she would have

to take the demotion to the role of floor nurse, unlike Blevins. [Ex. 31, Gregory Dep. 182:15-183:25].

Ray then recanted and said that there was no nurse role available. [Ex. 31, Gregory Dep. 182:15-183:25]. Plaintiff also reported to Ray that allowing Blevins to remain a Unit Supervisor with modified hours but requiring Plaintiff to take a demotion was unfair. [Id.]. In addition, although Ray claimed that Khrystal informed her there was only an LPN position available, she later filled the role with an RN and hired several other nurses. [Ex. 31, Gregory Dep. 184:4-16].

Ultimately, Plaintiff also informed Ray via text on May 5, 2019, that after speaking with her attorney, she would stay in her current position. [Ex. 11; Ex. 31, Gregory Dep. 190:18-191:3; Ex. 39, Ray Dep. 26:15-25, 28:22-29:1].

On or about June 11, 2019, Plaintiff reported suspected neglect of a patient to the AHCA. [Ex. 31, Gregory Dep. 212:12-213:24, 215:16-22]. Plaintiff discovered that a patient was left on his side in one position for more than twelve hours, resulted in trauma to his hand from the pressure. [Id.]. Plaintiff first prepared a report for Ray and also noted the incident in the chart. [Id.]. Plaintiff then reported the incident to the AHCA via their hotline. [Ex. 31, Gregory Dep. 214:21-215:22].

After Plaintiff contacted the AHCA, Ray came to Plaintiff's office, slammed the door, and screamed at Plaintiff that she should not have reported the incident, and that DCF was "climbing up her ass" because of it. [Id.]. Plaintiff reported Ray's

6

hostile reaction to Valerie de Cid, in the corporate office. [Ex. 31, Gregory Dep. 217:17-218:2]. Plaintiff stated to Valerie that Ray engaged in "shady behaviors" and del Cid responded that she did not like that term. [Ex. 31, Gregory Dep. 218:16-219:18].

Importantly, Florida law does not require actual proof of neglect or abuse; but nurses are required to report *suspected* abuse or neglect. [Ex. 31, Gregory Dep. 220:5-17]. Failure to do so can result in a felony charge and revocation of a medical license. [Id.]. However, del Cid demanded to know what law Ray had broken and stated that "shady behavior" was not illegal, even though it may not be ethical. [Ex. 31, Gregory Dep. 220:24-221:12].

Following her report to AHCA, Ray called Plaintiff "Hoochie Mama" and "Hoe Bag," and denied Plaintiff the opportunity to attend a training that she was later disciplined for missing. [Ex. 31, Gregory Dep. 222:6-23, 276:9-23]. Plaintiff never heard Ray call anyone else by those hostile and derogatory names. [Ex. 31, Gregory Dep. 276:24-277:9].

It is noteworthy that other nurses, like Ursula Countryman, testified that it was obvious that Ray did not like Plaintiff because "she spoke out and did what was right." [Ex. 37, Countryman Dep. 10:22-25]. Ray, Foley, and Shiver often gossiped about Plaintiff. [Ex. 37, Countryman Dep. 13:18-14:5]. Damron actually observed hostile treatment in response to Plaintiff, testifying that Ray, Shiver, and Mathieu

would challenge Plaintiff during morning meetings when she would bring up patient concerns and issues. [Ex. 33, Damron Dep. 18:7-19:14]. Her observations and judgment were often called into question. [Id.]. She further testified that the work environment was such that an employee would be dissuaded from making reports about patient care concerns. [Ex. 33, Damron Dep. 20:1-6].

Henderson observed Ray yell at Plaintiff following one of Plaintiff's reports about an incident that occurred during an overnight shift. [Ex. 32, Henderson Dep. 10:5-11:25; Ex. 33, Damron Dep. 42:4-15]. Ray was "livid" and told Plaintiff that she needed all her unit managers to be "team players." [Id.]. Ray would harass Plaintiff and call her names like "hoochie mama" and "hooker." [Id.].

Although not at issue presently, Plaintiff only has one kidney and also suffers from ADHD. [Ex. 31, Gregory Dep. 47:19-24]. The loss of her kidney has resulted in permanent health changes, such a frequent UTIs, less endurance, and an inability to work an overnight shift due to exhaustion and dehydration. [Ex. 31, Gregory Dep. 51:15-24, 53:8-19]. However, at issue presently, in late June or early July 2019, Plaintiff learned that she had the BRCA1 gene mutation. [Ex. 31, Gregory Dep. 210:4-23]. The BRCA1 gene mutation is fairly rare and occurs in less than one percent of the patients treated by both Plaintiff's OB/GYN and her plastic surgeon. [Ex. 43, Ramie Dep. 5:20-21, 12:9-23; Ex. 44, McAllister Dep. 16:5-9]. Although the presence of the gene does not guarantee a later cancer diagnosis, it places the

patient at an increased risk of breast and ovarian cancer. [Ex. 43, Ramie Dep. 12:24-13:6].

Very soon after learning of the presence of the BRCA1 gene mutation, on or about July 1, 2019, Plaintiff informed Ray of her diagnosis and that she would request leave soon for the surgical interventions required to hopefully minimize her cancer risks. [Ex. 31, Gregory Dep. 199:16-25, 200:1-14, 208:3-25; Ex. 32, Henderson Dep. 9:1-10:4; Ex. 39, Ray Dep. 23:3-11]. Others in the workplace were also aware of her diagnosis, and that Plaintiff did not have cancer, but was at risk for cancer in the future because of it. [Ex. 42, Foley Dep. 9:24-10:15]. Foley testified that she knew that Plaintiff was worried about her own prognosis and was considering having both a mastectomy and a hysterectomy performed to reduce her cancer risks. [Id].

Ray wrote Plaintiff up the day after Plaintiff told Ray that she had the BRCA1 gene, on July 2, 2019. [Ex. 12; Ex. 31, Gregory Dep. 199:16-25, 200:1-14, 208:3-25]. The write-up was also in retaliation for the very recent report to AHCA. [Ex. 31, Gregory Dep. 215:23-216:12].  Curiously, many of the alleged issues contained in the write-up happened months prior but were only being addressed after Ray found out about Plaintiff's diagnosis. [Ex. 31, Gregory Dep. 208:19-209:2]. Plaintiff disputed the write-up and prepared a written rebuttal to each accusation. [Ex. 12; Ex.

31, Gregory Dep. 201:5-202:14]. Ray testified that she received and read Plaintiff's written rebuttal. [Ex. 12; Ex. 39, Ray Dep. 35:5-25].

Of note, in the write-up, Plaintiff was accused of sabotaging the JCAHO certification by allegedly pointing out to the survey team that a refrigerator was not checked. [Ex. 12]. However, Plaintiff was actually praised and thanked for her work, further undermining the validity of the write up. [Ex. 11; Ex. 31, Gregory Dep. 205:12-22].

In response to discovering she has the BRCA1 gene mutation, Plaintiff underwent a full hysterectomy in September 2019. [Ex. 31, Gregory Dep. 55:5-22, 247:8-16]. Just prior to her hysterectomy, Plaintiff's ovaries were biopsied, and her physician, Dr. Ramie, discovered precancerous, abnormal cell growth. [Ex. 31, Gregory Dep. 63:11-64:9; Ex. 43, Ramie Dep. 37:18-41:21].

Plaintiff's hysterectomy was not "purely prophylactic" but also addressed her abnormal bleeding and fibroids, as well as her genetic susceptibility to ovarian cancer. [Ex. 43, Ramie Dep. 25:16-23]. Moreover, because Plaintiff's menopause was surgically induced, its onset was far more rapid. [Ex. 43, Ramie Dep. 35:22-36:5]. She was eventually placed on full hormone replacement, which also affected her ability to work twelve-hour shifts, as she was often exhausted by the schedule and the work itself. [Ex. 31, Gregory Dep. 56:9-24].

Plaintiff's postoperative instructions include no heavy lifting and no straining. [Ex. 43, Ramie Dep. 36:25-37:17]. This affected her ability to push, pull, or lift twenty-five pounds for a period of time, however. [Ex. 31, Gregory Dep. 55:5-22, 316:20-23].

Plaintiff was released back to her position - Unit Supervisor - with no restrictions on or about November 6, 2019. [Ex. 24; Ex. 31, Gregory Dep. 238:19-239:8]. Importantly, unit supervisors did not have to meet the same physical demands as floor nurses. [Ex. 39, Ray Dep. 18:11-22:2]. Plaintiff had discussed her physical limitations with Ray, who told Plaintiff to tell her physician to just state "no restrictions" on the work release regardless of her condition and she could then return to her Unit Supervisor role. [Ex. 31, Gregory Dep. 252:6-21].

Critically, Ray also publicly stated that administration was going to make Plaintiff so miserable that she would quit. [Ex. 34, Barfield Dep. 8:22-9:14, 20:9-25]. Shiver was present as well, in Ray's office, and the two discussed demoting Plaintiff as a way to get her to quit. [Id.].

Plaintiff actually returned to work on October 21, 2019. [Ex. 31, Gregory Dep. 161:15-18, 162:9-18]. At approximately 3:45pm, towards the end of her shift, she was called into a meeting with Anderson and Mathieu where they demanded to know her diagnosis, which Plaintiff refused to share because, as she explained, that is HIPAA-protected health information. [Ex. 31, Gregory Dep. 232:20-233:21].

Plaintiff had already told Anderson that she had the BRCA1 gene and was having surgery. [Ex. 31, Gregory Dep. 233:11-21, 234:17-22]. Plaintiff did not want to share the exact specifics of her surgery because the information was very private and personal. [Ex. 31, Gregory Dep. 234:4-20].

Ultimately, during that meeting, Anderson and Mathieu demoted Plaintiff to the position of floor nurse. [Ex. 31, Gregory Dep. 237:11-19, 238:8-240:4]. The two also attempted to cut Plaintiff's pay, but Plaintiff responded that she thought such an action was illegal, given her return from leave. [Ex. 31, Gregory Dep. 175:20-176:1].

Critically, in addition to the highly suspicious timing, Plaintiff was released to perform the duties of a Unit Supervisor. [Ex. 31, Gregory Dep. 248:20-249:25, 251:13-25]. However, she was demoted to the position of floor nurse, which had physical requirements which Plaintiff could not yet meet just a few weeks after her hysterectomy. [Id.]. This was another way in which Defendant attempted to force Plaintiff out, following the disciplinary actions and hostile name calling that began prior to her medical leave. [Id.]. Of note, Barfield was also mistreated while on light duty, and asked to perform tasks outside of his medical restrictions. [Ex. 34, Barfield Dep. 12:9-13:4].

Ray testified that "sometime during [Plaintiff's] leave" she was notified by Anderson that Plaintiff wanted to step down as a floor nurse. [Ex. 39, Ray Dep. 29:13-30:16]. Anderson claims that Plaintiff asked both her *and Ray* to move to a

floor nurse position. [Ex. 40, Anderson Dep. 15:8-16:11]. However, Anderson admits that Plaintiff's text messages to Ray state, quite clearly, that she would remain in her unit supervisor position. [Ex. 40, Anderson Dep. 19:3-9].

Anderson claims that when Plaintiff was in the process of returning from her FMLA leave for her hysterectomy, she requested a demotion. [Ex. 40, Anderson Dep. 20:8-15, 60:1-25]. However, she also testified that Plaintiff stated that she had "family issues" at home and needed to work different days to meet their needs. [Id.].

Plaintiff's physicians also urged her to undergo a pre-mastectomy mastopexy to test for ductal cancer and precancerous cells and situate the breast for a later mastectomy, and then complete the process with a total mastectomy. [Ex. 31, Gregory Dep. 105:11-106:1, 107:9-23]. Thus, in February 2020, Plaintiff underwent a lumpectomy with mastopexy. [Ex. 31, Gregory Dep. 60:5-61:18, 90:10-13].

Dr. McAllister, Plaintiff's plastic surgeon, testified that he recommended the mastopexy as the first of a staged process, with the goal of eliminating additional surgeries after the mastectomy and reconstruction. [Ex. 44, McAllister Dep. 14:12-15:3, 51:2-8]. Generally, the mastectomy is performed by a general surgeon and Dr. McAllister performs the reconstruction. [Ex. 44, McAllister Dep. 21:10-22:2]. He performed the mastopexy first "to even the breasts out to take up mitosis or excess skin, or for lack of a better term, sagginess, so that when we did the immediate reconstruction, along with the mastectomies, it would be a much easier surgery."

[Ex. 44, McAllister Dep. 23:17-25]. It was always designed to be a staged process. [Ex. 44, McAllister Dep. 55:24-56:12].

Dr. McAllister used the SPAIR technique, or the short-scar periareolar inferior reduction process, to create an incision that resembled an anchor around Plaintiff's nipple and under her breast. [Ex. 44, McAllister Dep. 27:1-25]. As with her hysterectomy, following her surgery, Dr. McAllister restricted Plaintiff from lifting, pushing, or pulling. [Ex. 44, McAllister Dep.36:5-16].

Although his notes indicate that Plaintiff was aesthetically happy with the results of the surgery, aesthetic results were not the point of this surgery. [Ex. 44, McAllister Dep. 53:9-54:6]. His practice is focused on the aesthetic results and reconstruction, he does not treat the cancer component in any patient - with cancer or prophylactically. [Id.]. Thus, as he testified, whether the patient is pleased with their results is his only real metric. [Id.].

Dr. McAllister had no independent recollection of whether Plaintiff developed sterile abscesses or had any issues related to the sutures. [Ex. 44, McAllister Dep. 41:17-42:11]. He did testify that the dissolvable stitch would either dissolve or be encased by the body and form small pustules, or sterile abscesses, which he explained was the body's way of "spit[ting] a stitch out." [Id.]. He does not always note them in his postoperative notes as they are fairly common. [Ex. 44, McAllister

14

Dep. 52:2-17]. They are known to ooze or otherwise seep as they "spit out" the stitch. [Id.].

Plaintiff testified that she did indeed develop sterile abscesses because she was allergic to the stitches used during her procedure. [Ex. 31, Gregory Dep. 241:8-24, 244:10-23]. In fact, Foley laughed at Plaintiff for bleeding through her scrubs, and asked "what the hell was wrong" with Plaintiff and if she was lactating. [Id.]. After she cleaned herself up, Plaintiff spoke with Ray about the incident. [Ex. 31, Gregory Dep. 242:6-25].

Plaintiff also had issues with her stitches ripping after the procedure, and Dr. McAllister had to apply silver nitrate to her wounds several times to stop the bleeding. [Ex. 31, Gregory Dep. 243:7-22]. She visited approximately four times for this same issue. [Ex. 31, Gregory Dep. 245:22-25].

Henderson observed the infection and the leaking, and testified, "oh my god, it looked really bad." [Ex. 32, Henderson Dep. 13:17-25, 30:14-31:22]. Another nurse, Deborah Amalfitano, also observed photographs of Plaintiff's breasts following surgery. [Ex. 38, Amalfitano Dep. 36:8-25]. The surgeons had placed chemotherapy wafers under her nipples and used sutures that she had some kind of allergic reaction to, causing the incisions to come apart. [Id.].

Anderson would have handled all disability accommodation requests but testified that she was "unaware" that Plaintiff required any accommodation. [Ex. 40,

Anderson Dep. 24:24-25:9]. She did not engage in the interactive process. [Id.]. She failed to engage in that process even though she was aware that Plaintiff had complications following her surgery, including that her stitches continued to open, and that Plaintiff was unable to lift, push, and pull as required of a floor nurse. [Ex. 13; Ex. 20; Ex. 31, Gregory Dep. 256:2-25, 316:24-317:15, 318:15-319:3; Ex. 40, Anderson Dep. 27:10-21].

Also following the procedure, Anderson then harassed Plaintiff's physician, Dr. McAllister. [Ex. 31, Gregory Dep. 230:14-231:24]. During one of Plaintiff's visits, his nurse, Brenda, took Plaintiff aside and told her to convey to Anderson that she would not release any of Plaintiff's HIPAA-protected information and would no longer take Anderson's phone calls. [Id.]. Brenda further informed Plaintiff that Anderson demanded to know Plaintiff's specific diagnosis and would not take "no" for an answer. [Id.].

Following the mastopexy, in March 2020, Defendant required Plaintiff to carry more than twenty-five pounds for distances greater than fifty feet despite her physician's restrictions. [Ex. 31, Gregory Dep. 95:12-97:23]. As a Unit Supervisor, however, Plaintiff was not required lift, push, or pull more than twenty-five pounds. [Ex. 31, Gregory Dep. 316:5-13]. Throughout her employment with Defendant, she was able to perform the essential functions of her position as a Unit Supervisor. [Id.].

Of note, Plaintiff has not yet had the mastectomy. [Ex. 31, Gregory Dep. 61:22-24]. As Plaintiff testified, she knows she needs to, but "it's a hard decision." [Ex. 31, Gregory Dep. 61:25-62:2]. She also does not currently have health insurance. [Ex. 31, Gregory Dep. 62:6-9]. Moreover, although she has a ninety-seven percent chance of developing breast cancer before the age of fifty-five, her recovery from the mastopexy was very difficult, further complicating her decision to undergo additional procedures. [Ex. 31, Gregory Dep. 62:10-25].

During Dr. McAllister's deposition, Defendant's counsel insinuated that Plaintiff had not yet undergone her mastectomies and thus may not have been sincere about her BRCA1 gene mutation. [Ex. 44, McAllister Dep. 48:12-21]. Dr. McAllister responded that he did not know what was going on in her life and could not offer an opinion. [Id.]. Moreover, he testified directly that he did not doubt the sincerity of her concerns. [Ex. 44, McAllister Dep. 50:23-51:1].

While Plaintiff was on leave, Ray told employees that Plaintiff did not take medical leave to take preventative measures against the BRCA1 gene but took leave for a cosmetic procedure to have work done on her breasts. [Ex. 32, Henderson Dep. 7:14-8:15]. She also accused Plaintiff of "faking cancer." [Ex. 32, Henderson Dep. 11:23-12:5]. Ray said that Plaintiff did not have cancer and took leave for a "boob job." [Id.]. Henderson responded that Plaintiff was having surgery related to cancer and Ray responded again that Plaintiff instead had cosmetic breast surgery. [Id.].

Following the mastopexy, Foley began to refer to Plaintiff as "cancer chick" in a derogatory manner, as if to say she was claiming that she had cancer but did not. [Ex. 31, Gregory Dep. 235:10-21]. Ray had hiring and firing authority at the time she made these comments because she was now Plaintiff's supervisor. [Ex. 31, Gregory Dep. 235:22-25]. This happened on at least five occasions. [Ex. 31, Gregory Dep. 280:9-16].

On April 14, 2020, Plaintiff reported to Amanda Carswell that she had experienced workplace discrimination. [Ex. 14; Ex. 31, Gregory Dep. 260:23-261:21]. Although she also raised other workplace concerns, specifically noting that she took issue with the demands to provide her "exact diagnosis" and that, as she had stated previously, she took issue with the decision to demote her on the day she returns from medical leave. [Id.].

On or about April 15, 2020, Plaintiff reported that Foley was about to administer medication that was contraindicated given the patient's history of gastrointestinal bleeding, and that she needed to contact the physician for confirmation. [Ex. 17]. Foley immediately went to the nurses' station and stated that the "stupid little cancer chick thinks she knows everything." [Ex. 31, Gregory Dep. 288:17-24]. Plaintiff was again called names following her report about the patient with the GI bleed. [Ex. 17; Ex. 31, Gregory Dep. 283:15-285:3; Ex. 34, Barfield Dep. 10:2-12].

18

On May 7, 2020, Plaintiff prepared a written request for a night-shift position. [Ex. 15]. She did so to get away from management. [Ex. 31, Gregory Dep. 273:13-25]. Although working overnight greatly exacerbated her disabilities, it was a better option than enduring the harassment she experienced at the hands of management. [Ex. 31, Gregory Dep. 274:1-17].

Plaintiff was so emotionally distraught by the ongoing harassment and hostile work environment that she experienced physical manifestations. [Ex. 31, Gregory Dep. 295:23-296:24]. She also became extremely depressed, and felt she was in an ongoing battle between her moral and ethical duties and her fear of reprisal. [Id.]. The situation became so dire that Plaintiff actually reached out to Kristi Damron about mental health care providers to treat her suicidal ideations. [Ex. 31, Gregory Dep. 301:1-9].

Interestingly, Damron found the environment similarly toxic, and developed anxiety and mouth sores from the stress. [Ex. 33, Damron Dep. 16:10-25]. She also made numerous reports and complaints throughout her employment. [Ex. 33, Damron Dep. 20:1-23:22].

Plaintiff was terminated on or about June 5, 2020. [Ex. 31, Gregory Dep. 20:9-18]. Her termination is not at issue here.

Of great significance, Foley, who admittedly had far less experience than Plaintiff, replaced Plaintiff as Unit Supervisor. [Ex. 40, Anderson Dep. 23:15-18;

Ex. 42, Foley Dep. 6:9-19]. In fact, Foley testified that she had a lot of respect for Plaintiff and saw her as a mentor because Foley was a new nurse and Plaintiff was very experienced. [Ex. 42, Foley Dep. 11:21-12:8]. Foley is not disabled and did not engage in any protected whistleblowing. [Ex. 39, Ray Dep. 39:20-40:4; Ex. 40, Anderson Dep. 23:19-24:5; Ex. 42, Foley Dep. 19:3-7].

According to both Dr. Ramie and Dr. McAllister, Plaintiff suffered abnormal cell growth.  [Ex. 44, McAllister Dep. 52:23-53:6; Ex. 43 Ramie Dep. 37:22-38:13, 40:22-41:42].  This abnormal cell growth took the forms of fibroids, polyps, cysts, and cervicitis with hyperkeratosis and parakeratosis.  [Id.].

## MEMORANDUM OF LAW

I.   **Summary Judgment Standard**

A  plaintiff  will  always  survive  summary  judgment  if  she  presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent. Smith v. Lockheed-Martin Corporation, 644 F.3d 1321, 1328 (11th Cir. 2011). As shown below, disputed facts remain, and summary judgment must be denied.

In addition, Defendant relies on various affidavits to support its insistence that Plaintiff did not engage in protected activity and that she was not the victim of discrimination and retaliation. However, Plaintiff offered considerable evidence and testimony that disputes Defendant's contentions. The Court must disregard those

declarations and the evidence and inferences Defendant impermissibly draws in its own favor. Reeves v. Sanderson Plumbing Products, Inc., 530, U.S. 133, 149-150 (2000). The Reeves Court unequivocally stated, although the court should review the record as a whole, it *must* disregard all evidence favorable to the moving party, which the jury is not required to believe. That is, the court should give credence to the evidence favoring the non-movant as well as evidence supporting the moving party that is *uncontradicted and unimpeached,* at least to the extent that that evidence comes from *disinterested witnesses.* Id. at 150-151 (quoting 9A C. Wright & Miller, Federal Practice and Procedure 2529 (2d Ed. 1995) at 300 (emphasis added)). Because Defendant's evidence comes from interested witnesses, it cannot be credited against Plaintiff at this stage. Further, where Defendant's evidence is contradicted or impeached, it cannot be credited. Id. Here, the record contains disputed issues of material fact, as shown below, that must be resolved by the jury.

## II.   Plaintiff was the Victim of Discrimination and Retaliation

### A.   Plaintiff has established a *prima facie* case of disability discrimination.

To establish a *prima facie* case of disability discrimination, Hines must establish that (1) she has a disability; (2) she is a qualified individual with a disability; and (3) she was unlawfully subjected to discrimination based on his disability.  See Terrell v. USAir, 132 F.3d 621, 624 (11th Cir. 1998); see also Talavera v. School Board of Palm Beach Co., 129 F.3d 1214, 1217 (11th Cir. 1997).

21

As shown below, Plaintiff is able to establish her *prima facie* case in a number of ways, and summary judgment must be denied.

### 1.    Plaintiff is a qualified individual with a disability.

A "qualified individual with a disability" is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). In the ADA, Congress has defined "disability" as a: (1) physical or mental impairment that substantially limits one or more of the major life activities of an individual; (2) a record of such impairment; or (3) being regarded as having such impairment. 42 U.S.C. § 12102(2).

> The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis. [] An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

29 C.F.R. § 1630.2(j)(1). Disability is to be "construed in favor of broad coverage," 42 U.S.C. § 12102(4)(A); Coker v. Enhanced Senior Living, Inc., 897 F. Supp. 2d 1366, 1375 (N.D. Ga. 2012).

Defendant asserts that the presence of the BRCA1 gene mutation does not qualify Plaintiff as actually disabled. Plaintiff disagrees.  At best, the law is

22

inconclusive as to whether testing positive for the genome but remaining otherwise asymptomatic qualifies as a disability. See generally, O'Rourke v. Tiffany & Co., 2020 WL 1492865, at *6 (D.R.I. Mar. 27, 2020), aff'd, 988 F.3d 23 (1st Cir. 2021) ("It is unclear whether an individual who has a genetic predisposition (i.e., the BRCA2 gene mutation) for a qualifying disability (i.e., breast cancer), but who is asymptomatic, qualifies as 'disabled' under the ADA. This appears to be a novel issue courts have not yet addressed.").

More importantly, there can be no meaningful argument that Plaintiff was not limited in her major life activities by the BRCA1 gene mutation, she has permanent anatomical loss as a result of the prophylactic hysterectomy she had to alleviate the risk of ovarian cancer posted by her BRCA mutation diagnosis which permanently affects her reproductive system.  Further, according to both Dr. Ramie and Dr. McAllister, Plaintiff suffered abnormal cell growth in several different forms.  This abnormal growth took the forms of fibroids, polyps, cysts, and cervicitis with hyperkeratosis and parakeratosis.  Both the removal of her reproductive organs and her abnormal cell growth demonstrate that Plaintiff is "disabled" pursuant to the ADA, as she was substantially limited in a major life activity. 42 U.S.C. § 12102(1)(A).

The ADA was amended in 2008, effective in 2009, by the ADAAA. The very purpose of the 2008 Act was to correct and overturn erroneous Supreme Court decisions, and, more broadly, the entire body of federal case law imposing overly restrictive interpretations of the term "disability" that were contrary to the original intent of the 1990 Congress. The fact that Congress issued such sweeping changes bolsters the interpretation that the substantially limited major life function is not an onerous standard. See 29 C.F.R. § 1630.2(j)(1)(i).

Through the amendments to the ADA in 2008, major life activities are more broadly defined, adding to that list any "operation of a major bodily function, including ... reproductive functions. . . and normal cell growth." 42 U.S.C. § 12102(2)(B); 29 C.F.R. § 1630.2(i)(1)(ii); *See also,* Lonergan v. Fla. Department of Corrections, 623 F. App'x 990, 993 (11th Cir. 2015)(normal cell growth is a major life activity); Coker v. Enhanced Senior Living, Inc., 897 F. Supp. 2d 1366, 1375-1376 (N.D. Ga. 2010)(Plaintiff's breast disease and abnormal cell growth constituted a disability).  Significantly, in Darby v. Childvine, Inc. , the Court held that Darby's BRCA gene mutation and her abnormal cell growth were disabilities under the ADA. Darby v. Childvine, Inc., 964 F.3d 440, 446-447 (6th Cir. 2020).

"Physical or mental impairment" is defined in federal regulations to include "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems." 29 C.F.R. § 1630.2(h)(1).  Notably, the

"degree of functional limitation required for an impairment to constitute a disability" does not "create a demanding standard." 29 C.F.R. pt. 1630, App. § 1630.2(j)(1)(iv). The "disability determination" is "not an onerous burden" under the ADA." Id.

Based on the foregoing, Plaintiff is disabled.

Defendant also argued "that 'impairment' in the first 'actual disability' prong, § 12102(1)(A), is limited to impairments that exist at the time of the adverse employment action and does not include impairments that manifest after the alleged discrimination." [Doc. 25, pg. 21, citing Mazzeo v. Color Resolutions Int'l, LLC, 746 F.3d 1264, 1268 (11th Cir. 2014)]. However, there is no dispute that Plaintiff was demoted to the position of floor nurse on the very day she returned from leave following her hysterectomy. Moreover, there is evidence that the decision to demote Plaintiff and replace her with a non-disabled employee, Foley, was made prior to her return. Thus, Defendant's argument is without merit, as Plaintiff's disabling condition existed at the time of her demotion.

In addition to being actually disabled, there is evidence in this record that Defendant perceived Plaintiff to be disabled. An employee establishes that she was "regarded as having such an impairment" if she shows that she has been subjected to an action prohibited by the ADA on the basis of an actual or perceived physical impairment, "whether or not the impairment limits or is perceived to limit a major

life activity." <u>Andrews v. City of Hartford</u>, 700 Fed. Appx. 924, 926 (11th Cir. 2017)

(quoting 42 U.S.C. § 12102(3)(A)).

> Because "a disability claim based upon a 'regarded as'
> theory requires a determination about the subjective state
> of mind of the employer," the claim is not easily evaluated
> on the basis of depositions and affidavits and is "generally
> more appropriate for the jury than for the judge."

<u>Washington v. Quincy Corp.</u>, 2011 WL 13232150, at *9 (N.D. Fla. Sept. 13, 2011)

(citing <u>Mendiola v. Vision Hospitality</u>, 588 F. Supp.2d 1295, 1304–05 (M.D. Ala.

2008)). The <u>Washington</u> Court denied summary judgment, citing the fact that the

plaintiff was suddenly terminated because of an infraction for which no other

employee has previously been terminated. <u>Id</u>. Moreover, to prove the "regarded as"

prong, temporal proximity may serve as circumstantial evidence of intent.

<u>Washington</u>, 2011 WL 13232150 at *8 (N.D. Fla. Sept. 13, 2011). Here, both the

suspect nature of the demotion and its alleged justifications combined with the

immediate temporal proximity – the very day she returned from leave – support

Plaintiff's initial *prima facie* proffer. Furthermore, Plaintiff was referred to as

"cancer chick" and was accused of faking cancer.  In addition, the day following

Plaintiff's revelation to Ray that she had the BRCA1 gene mutation and would

require time off for several surgeries, Ray disciplined Plaintiff for things she did not

do and that happened months prior.

26

Thus, Plaintiff is able to establish a *prima facie* case of disability discrimination based on Defendant's perception of her as disabled, as well as her actual disability. Summary judgment must be denied.

### 2.     Defendant failed to reasonably accommodate Plaintiff.

Here, Defendant argues that Plaintiff "admits" that she was provided the leave time she requested for surgery, and that she was released back to work. Defendant continues that Plaintiff did not request any additional accommodation, and thus her claim based on a failure to accommodate fails. Given Anderson's admission that she did not engage in the interactive process with Plaintiff in any way, Defendant's argument here fails. Furthermore, Defendant misses the point.  As Defendant completely ignored Plaintiff's medical restrictions and, worse, knowing her restrictions, demoted her to a floor nurse position which, unlike her supervisor position, required physical work beyond her restrictions.

Critically, an essential duty of an employer to provide reasonable accommodations to employees under the ADA is the duty to engage in the interactive process. 29 C.F.R. § 1630.2(o)(3); 29 C.F.R. § 1630.9. To initiate this mandatory interactive process, an employee must make the employer generally aware that they are suffering from a disability and need accommodation. See EEOC v. Chevron Phillips Chem. Co., LP, 570 F.3d 606, 621 (5th Cir. 2009). Once an employee makes such a request, however, the employer is obligated by law to engage in an

"interactive process": "a meaningful dialogue with the employee to find the best means of accommodating that disability." Id. (quoting Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 108 (1st Cir. 2005). The process thus requires "communication and good-faith exploration." Kleiber v. Honda of Am. Mfg., 485 F.3d 862, 871 (6th Cir. 2007). When an employer does not engage in a good faith interactive process, that employer violates the ADA—including when the employer discharges the employee instead of considering the requested accommodations. Cutrera v. Bd. of Supervisors of La. St. Univ., 429 F.3d 108, 113 (5th Cir. 2005) ("An employer may not stymie the interactive process of identifying a reasonable accommodation for an employee's disability by preemptively terminating the employee before an accommodation can be considered or recommended."). Despite Plaintiff's reports that her wounds continued to open and that she was struggling post-operatively, Anderson admits that she did not engage in the interactive process although it was her job to do so. Similarly, Plaintiff was demoted to the position of floor nurse, for which her postoperative restrictions were contraindicated. Despite her concerns, the demotion and job tasks stood. However, Plaintiff was always able to perform the functions of her Unit Supervisor position.

Moreover, the failure to provide an accommodation is itself unlawful discrimination. See Holly v. Clairson Indus., LLC, 492 F.3d 1247, 1249, 1262 (11th Cir. 2007); see also, 42 U.S.C. § 12112(b). Likewise, the failure to engage in the

interactive process to determine reasonable accommodations that do not cause the employer an undue burden is unlawful discrimination. See Chevron, 570 F.3d at 621-22. After Plaintiff shows that her reasonable accommodation was denied, the burden upon Defendant is to show that it was unreasonable – but that is the end of the inquiry and there is no pretext analysis. See Holly, 492 F.3d at 1262-63; 29 CFR § 1630.9; see also, Willis v. Conopco, Inc., 108 F.3d 282, 286 (11th Cir. 1997) (once the plaintiff establishes the requested accommodation as reasonable, the defendant has a duty to show that the accommodation posed an undue burden on its operation.); U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 401-02 (2002) (after the complainant has shown the accommodation is reasonable on its face, the burden shifts to the employer to provide specific evidence establishing the accommodation would cause an undue hardship under the particular circumstances). Moreover, accommodations are reasonable if it permits the plaintiff to perform her essential job functions. See Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000); 42 U.S.C. § 12112(b)(5)(A). Here, Defendant insists that Plaintiff was demoted at her own request, yet Plaintiff has repeatedly denied this claim. Although she previously inquired about a different position following her mother's fall, she retracted the request and stated that she would remain a Unit Supervisor. There is thus no justification for her demotion, and it would not have been an unreasonable accommodation to simply leave her in her supervisor position.

29

Based on the admitted failure to engage in the interactive process with Plaintiff, Defendant violated the ADA. Defendant has not shown how leaving Plaintiff in her Unit Supervisor position would cause any undue hardship, and thus Defendant failed to reasonably accommodate Plaintiff. Summary judgment must be denied.

### 3. Plaintiff experienced an adverse action as a direct result of her actual or perceived disability.

Defendant claims that Plaintiff did not experience an adverse action because she requested the demotion, which as shown repeatedly throughout, is false. Her demotion is materially adverse, and Plaintiff easily establishes this element of her *prima facie* case.

Generally, an adverse employment action must "impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way." Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir. 2001) (overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)). Importantly, however, "direct economic consequences" is not required, but a plaintiff must show "a serious and material change in the terms, conditions, or privileges of employment." Id. There is no dispute that she was demotion, and there can be no dispute that such a demotion to a more physically intense role with different and longer working hours was a serious and material change to the terms and conditions of her employment.

30

Defendant then argues that Plaintiff must meet the "but-for" causation standard to determine whether an adverse employment action occurred "because of" a disability. [Motion, pg. 24, citing Barber v. Cellco P'ship, 808 F. App'x 929, 935 (11th Cir. 2020)]. It continues by arguing that discrimination is about "actual knowledge" and the decisionmaker must thus be aware of the disability. However, the record is clear that Plaintiff informed Ray, Mathieu, *and Anderson* about her diagnosis and need for surgery. [Ex. 31, Gregory Dep. 233:11-21, 234:17-22].

Defendant further argues that Plaintiff cannot meet her burden of proof because she requested the demotion, eventually earned more as a floor nurse, and "thanked" her supervisor for the change. However, Plaintiff requested a floor nurse position in late April 2019 to care for her mother but within less than two weeks retracted this request and advised that she was staying in her supervisor position. Plaintiff continued to work as a Unit Supervisor for six months but was demoted to floor nurse mid-October 2019, the day she returned from medical leave.  Further, Plaintiff told Mathieu that reducing her pay at the time of her demotion might be illegal and her "thanking" her supervisor was done simply to maintain professionalism when she responded to text messages sent to various supervisors. Defendant's version of the facts, supported by its own self-serving affidavits, must not be believed over Plaintiff's facts at this stage. Summary judgment must be denied.

### 4.   Plaintiff proffered evidence of a "convincing mosaic" of discrimination sufficient to support her *prima facie* case.

In <u>Lewis v. City of Union City, Georgia</u>, 918 F.3d 1213 (11th Cir. 2019), the Eleventh Circuit stated that a plaintiff alleging intentional discrimination "must present sufficient facts to permit a jury to rule in her favor." <u>Lewis</u>, 918 F.3d at 1220. The Court continued that "[o]ne way that she can do so is by satisfying the burden-shifting framework set out in <u>McDonnell Douglas</u>." <u>Id.</u> Importantly, the Court also stated that a

> plaintiff can also present direct evidence of discriminatory intent, <u>see</u>, <u>e.g.</u>, <u>Jefferson v. Sewon America, Inc.</u>, 891 F.3d 911, 921–22 (11th Cir. 2018), *or demonstrate a "convincing mosaic" of circumstantial evidence that warrants an inference of intentional discrimination*, <u>see</u>, <u>e.g.</u>, <u>Smith v. Lockheed-Martin Corp.</u>, 644 F.3d 1321, 1328 (11th Cir. 2011) (citation and quotation marks omitted).

<u>Lewis</u>, 918 F.3d at 1221, n. 6 (emphasis added). The "convincing mosaic" standard does not require the formal presentation of each factor of the *prima facie* case.

Thus, "establishing the elements of the <u>McDonnell Douglas</u> framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case…[and] the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." <u>Smith v. Lockheed-Martin Corp.</u>, 644 F.3d 1321, 1328 (11th Cir. 2011); <u>see</u> <u>also</u> <u>Chapter 7 Trustee v. Gate Gourmet, Inc.</u>, 683 F.3d 1249, 1255 (11th Cir. 2012) (quoting

Lockheed-Martin). If the plaintiff cannot produce a comparator, she "will always survive summary judgment if she presents circumstantial evidence that creates a triable issue concerning the discriminatory intent." Lockheed-Martin, 644 F.3d at 1328; see also Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1320 (11th Cir. 2012). The circumstantial evidence creates a triable issue if it, "viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" Lockheed-Martin, 644 F.3d at 1328 (quoting Silverman v. Bd. Of Educ., 637 F.3d 729, 734 (7th Cir. 2011)); see also Holland v. Gee, 677 F.3d 1047, 1062 (11th Cir. 2012) (holding plaintiff submitted sufficient circumstantial evidence for jury to find termination motivated by discrimination).

In addition to the arguments and evidence above, the record as a whole establishes that Defendant took action against Plaintiff because of her disability. She was a well-respected Unit Supervisor and nurse at St. James and only after she informed Ray and others in administration that she was diagnosed with the BRCA1 gene mutation and would require leave for surgeries did that change. She was immediately disciplined without justification and based on events that occurred well prior to the date of the write up, and she was demoted on the very day she returned from leave. Moreover, although it followed her demotion, Ray spread rumors that Plaintiff was "faking cancer" even though she was clear her treatments were to

prevent cancer. She was called derogatory names as well, including "cancer chick" while her nursing judgment was called in to question.

Plaintiff's burden at this stage is not onerous. <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248 (1981). Without doubt, when viewing the record in a light most favorable to Plaintiff, a reasonable jury could conclude that her disability and need for medical leave to treat her condition was the cause of her demotion and the ongoing harassment she experienced. Summary judgment must be denied.

**5.    Plaintiff experienced hostile work environment based on her disability.**

To establish a *prima facie* case of hostile work environment discrimination, Plaintiff must establish: "(1) that [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as [disability]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability." <u>Miller v. Kenworth of Dothan, Inc.</u>, 277 F.3d 1269, 1275 (11th Cir. 2002).

Plaintiff established above that she is disabled. The record also makes clear that she was subjected to unwelcome harassment, including derogatory name calling

and a demotion, because of her medical condition. She thus satisfies the first three elements.

The fourth element requires that Plaintiff show that the harassing conduct was sufficiently severe or pervasive "to alter an employee's terms or conditions of employment." Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 809 (11th Cir. 2010). The severity or pervasiveness are examined from both Plaintiff's subjective view as well as an objective perspective, that "of a reasonable person in the plaintiff's position, considering all the circumstances." Id. The Eleventh Circuit has described four elements to examine when determining the objective component: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Mendoza, 195 F.3d at 1246. Plaintiff need not establish evidence under each element. See Freytes-Torres v. City of Sanford, 270 Fed. Appx. 885, 890-91 (11th Cir. 2008) (reversing summary judgment where plaintiff met three of the four factors cited in Mendoza).

Here, Plaintiff testified that her judgment was often undermined, and Foley would refer to her as "cancer chick." Ray spread hurtful rumors about Plaintiff taking leave for "a boob job" instead of the first steps towards a complete bilateral mastectomy to hopefully prevent cancer in the future. Plaintiff testified that she

35

became depressed and anxious as a result of the conduct. She was also demoted, and thereafter harassed to such a degree that she voluntarily sought a nightshift position to "get away" from administration, even though working overnight heavily exacerbated her medical conditions. The conduct thus unreasonably interfered with her ability to continue working and performing her job duties and was objectively humiliating.

Defendant finally argues that it cannot be liable because Plaintiff did not report the conduct to Defendant. This is false. In April 2020, Plaintiff reported the discriminatory conduct to Carswell, but no action was taken to remedy the situation and Plaintiff continued to experience harassment. [Ex. 14]. Thus, Plaintiff has established the elements of a *prima facie* case of hostile work environment, and summary judgment must be denied.

### B.   Plaintiff has established a *prima facie* case retaliation based on her reports about disability-based discrimination.

To establish her *prima facie* case of retaliation, Plaintiff must show that she engaged in statutorily protected activity, she suffered an adverse employment action, and that there is a causal connection between the two. Bryant v. Jones, 575 F.3d 1281, 1307-08 (11th Cir. 2009). Defendant appears to dispute all three.

However, there can be no meaningful dispute that Plaintiff engaged in protected activity on at least two occasions. First, during the October 21, 2019 demotion meeting, Plaintiff expressed her opinion that reducing her salary as part of

the demotion was illegal. While her salary ultimately stayed the same, the demotion stood. Then, in April 2020, she reported discrimination to Carswell.

There is no dispute that Plaintiff was demoted, and Plaintiff testified that she did not request the demotion, and thus is it materially adverse, as shown above. Equally important here, to satisfy the "adverse action" element of her *prima facie* proffer, Plaintiff need only show that retaliation produced an objective injury or harm, such that it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Edgerton v. City of Plantation, 682 F. App'x 748, 750 (11th Cir. 2017) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 77 (2006)); Gowski v. Peake, 682 F.3d 1299, 1312 (11th Cir. 2012) (recognizing a cause of action for a retaliatory hostile work environment). Here, immediately following her complaints about the possibility of a pay reduction, Plaintiff's demotion was allowed to stand, and she continued to experience workplace harassment, with Foley even referring to her as "cancer chick." The same conduct persisted after her report to Carswell. Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1363 (11th Cir. 2007) ("mere temporal proximity, *without* more, must be 'very close.'") (emphasis added).

To establish a causal connection, this Court must look at the totality of the collective and continuous adverse employment actions, or the "whole scenario" as opposed to isolate events in a vacuum. See Wideman v. Wal-Mart Stores, Inc., 141

F.3d 1453, 1455-56 (11th Cir. 1998); Hare v. Potter, 220 Fed.Appx. 120, 132 (3d Cir. 2007); Brown v. Walt Disney World Co., 805 F.Supp 1554, 1560 (M.D Fla. 1992). Moreover, courts "construe the causal link element broadly so that a 'plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998); see also Wideman, 141 F.3d at 1457; EEOC v. Reichold Chems., Inc., 988 F.2d 1564, 1571 (11th Cir. 1993). Where the protected speech and adverse employment action are close in time, causation may be inferred. See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (finding three to four-month disparity between protected expression and employment action was not enough to demonstrate a causal connection). In addition to temporal proximity, Gregory may establish a connection between her protected activity and adverse employment action that could "reasonably support [a] jury's determination." Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998). However, there is no bright line regarding timing and inference. See e.g., Wideman, 141 F. 3d at 1457 (11th Cir. 1998); Embry v. Callahan Eye Found. Hosp., 147 Fed.Appx. 819, 831 (11th Cir. 2005).

In addition, Defendant argues that Plaintiff must satisfy the "but-for" standard to prevail. However, the "but for" causation standard is an inquiry focused on the burden of proof at trial, not the burden of persuasion necessary to defeat summary

judgment. <u>Univ. of Texas Southwestern Med. Ctr. v. Nassar</u>, 570 U.S. 338, 344-347 (2013). <u>Nassar</u> holds that "but-for causation…requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." <u>Id.</u> at 360. "The term 'because of' appears frequently in antidiscrimination laws [and it] typically imports, at a minimum, the traditional standard of but-for causation." <u>EEOC v. Abercrombie & Fitch Stores, Inc.</u>, 575 U.S. 768, 772-73 (2015). Simply put, "but for" means that the protected activity "was the factor that made a difference." <u>Leal v. McHugh</u>, 731 F.3d 405, 415 (5th Cir. 2013). Justice Scalia explained that a variety of factors may be at play in a given scenario, but if the other factors standing alone would not have produced the same outcome, then it was "but for" the final or determinative act – "the straw that broke the camel's back." <u>Burrage v. United States</u>, 571 U.S. 204, 211 (2014).

Here, the pattern of cause and effect could not be clearer. Plaintiff informed Ray and administration that she was diagnosed with the BRCA1 gene mutation and would require significant time off to undergo several surgeries to hopefully prevent cancer in the future. She was *immediately* disciplined. Although her leave time was approved, she was *immediately* demoted upon her return to work following the hysterectomy. Thereafter she was called derogatory names, including "cancer chick" and Ray spread rumors about Plaintiff, telling other employees that she did not have a medical condition and took leave for a "boob job." Given that her burden at this

stage is "not onerous," Plaintiff easily establishes the *prima facie* elements of a claim for retaliation, and summary judgment must be denied. <u>See</u> <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).

**C.    Plaintiff has established a *prima facie* case whistleblower retaliation.**

Plaintiff's *prima facie* proffer here is identical to the one above for disability retaliation. However, first and foremost, Defendant is incorrect that to establish a claim for Private Sector Whistleblower Retaliation under Chapter 448 requires proof of an "actual violation" of law. Defendant asks this Court to depart from the current prevailing law on this issue in Florida, the <u>Aery</u> decision, which it cites in its Motion. <u>Aery v. Wallace Lincoln-Mercury, LLC</u>, 118 So. 3d 904, 916 (Fla. 4th DCA 2013). To establish that she engaged in statutorily protected expression, as required to support a claim under the Act, all that is required is that the employee have a good faith, objectively reasonable belief that her activity is protected by the statute. <u>Thomas v. Tyco Int'l Management Co., LLC</u>, 262 F.Supp.3d 1328 (S.D. Fla. 2017); <u>Bonnafant v. Chico's FAS, Inc.</u>, 17 F.Supp.3d 1196 (M.D. Fla. 2014).

The Northern District of Florida[1] has held that the "good faith" standard applies, particularly where the question remains unresolved in state court. In <u>O'Steen</u>

---

[1] Defendant cites <u>Vuolo v. MHM Health Professionals LLC</u>, 2022 U.S. Dist. LEXIS 113385, at 5-8 (N.D. Fla. May 24, 2022), however that case is currently on appeal before the Eleventh Circuit on this very issue.

v. Fla. Sports Foundation, Inc., Case No. 4:19cv106-MW-MAF, Docket Number 48,

Judge Walker explained:

> The parties dispute whether the FWA requires Plaintiff to prove she reported an actual violation of law, or only that she had a good-faith belief she was reporting an actual violation of law irrespective of whether Defendant's conduct was actually illegal. The Supreme Court of Florida has instructed courts to construe the FWA broadly and to favor access to its remedy. Irven v. Dep't of Health and Rehab. Servs., 790 So. 2d 403, 406 (Fla. 2001); Martin Cty. v. City of Edenfield, 609 So. 2d 27, 29 (Fla. 1992). The Supreme Court of Florida has not, however, held either standard is the correct one to apply in FWA cases. Florida's Fourth District Court of Appeal has held the "good faith" standard is correct. Aery v. Wallace Lincoln-Mercury, LLC, 118 So. 3d 904, 916 (Fla. 4th DCA 2013). Florida's Second District Court of Appeal has disagreed in a dictum, Kearns v. Farmer Acquisition Co., 157 So. 3d 458, 465 (Fla. 2d DCA 2015), but this neither disturbs nor conflicts with the Fourth District's decision. This Court's duty is thus to follow Aery. See Winn-Dixie Stores, Inc. v. Dolgencorp, LLC, 746 F.3d 1008, 1021 (11th Cir. 2014) (explaining federal courts must follow the decisions of a state's intermediate appellate courts where the state supreme court has not ruled on the correct interpretation of the law).

O'Steen v. Fla. Sports Foundation, Inc., Case No. 4:19cv106-MW-MAF, opinion of

June 12, 2020.

Following that same sound logic, several other district courts within the

Eleventh Circuit have adopted the good faith, objectively reasonable belief standard

announced in Aery. See, e.g., Valdez v. Colony Shiny Staff, LLC, 2021 WL 244061,

at *11 (S. D. Fla. Jan. 25, 2021); Buzzell v. Florida Keys Ambulance Service, Inc.,

2020 WL 2071956, at *4, n.2 (S.D. Fla. Apr. 29, 2020); <u>Nardella v. Atlantic TNG,</u>

<u>LLC</u>, 2020 WL 2331179, at *11 (M.D. Fla. May 11, 2020); <u>Ritenour v. AmeriGas</u>

<u>Propane, Inc.</u>, 2019 WL 2008675, at *6–7 (S.D. Fla. Mar. 15, 2019); <u>Tillman v.</u>

<u>Advanced Public Safety, Inc.</u>, 2016 WL 11501680, at *4 (S.D. Fla. Nov. 14, 2016);

<u>Thomas </u>262 F.Supp. 3d at 1340 (S.D. Fla. 2017); <u>Villaman v. United Parcel Serv.,</u>

<u>Inc.</u>, 2019 WL 922704, at *6, n.2 (S.D. Fla. Feb. 8, 2019).

In <u>O'Steen</u>, Judge Walker acknowledged and analyzed both <u>Aery</u> and <u>Kearns</u>

and their diametric opposition on the issue. The court ultimately rejected the <u>Kearns</u>

holding on the point for several reasons. First, and perhaps most importantly, the

<u>Kearns</u> holding is *dicta*, as recognized by many courts:

> In <u>Aery v. Wallace Lincoln-Mercury, LLC</u>, the Fourth
> District Court of Appeal held that to prevail on a FWA
> claim, a plaintiff must demonstrate that he or she held a
> good faith, reasonable belief that the actions of the
> employer violated the law. 118 So. 3d 904, 916 (Fla. 4th
> DCA 2013). Subsequently, in <u>Kearns v. Farmer</u>
> <u>Acquisition Co.</u>, 157 So. 3d 458, 465 (Fla. 2d DCA 2015),
> the Second District Court of Appeal interpreted the
> language of FWA to require an actual violation of the law.
> However, as the Middle District of Florida has explained,
> <u>Aery</u> remains the controlling law on the issue because the
> discussion concerning the actual violation standard in
> Kearns was only in dicta. <u>Burns v. Medtronic, Inc.</u>, No.
> 8:15-CV-2330-T17-TBM, 2016 WL 3769369, at *5 (M.D.
> Fla. July 12, 2016); <u>Canalejo v. ADG, LLC</u>, No. 8:14-CV-
> 17-T-MAP, 2015 WL 4992000, at *2 (M.D. Fla. Aug. 19,
> 2015). Hence, despite the recent criticism of <u>Aery</u> in the
> case law, this Court is bound to apply <u>Aery</u>.

Tillman, 2016 WL 11501680 at *4, n.1 (S. D. Fla. Nov. 14, 2016). In its decision in

Thomas, the Southern District of Florida confirmed the same:

> In Aery v. Wallace Lincoln–Mercury, LLC, the Fourth
> District Court of Appeal held that to prevail on a FWA
> claim, a plaintiff must demonstrate that he or she held a
> good faith, reasonable belief that the actions of the
> employer violated the law. 118 So.3d 904, 916 (Fla. 4th
> DCA 2013). Subsequently, in Kearns v. Farmer
> Acquisition Co., 157 So.3d 458, 465 (Fla. 2d DCA 2015),
> the Second District Court of Appeal interpreted the
> language of FWA to require an actual violation of the law.
> However, as the Middle District of Florida has explained,
> Aery remains the controlling law on the issue because the
> discussion concerning the actual violation standard in
> Kearns was only in dicta.

Thomas, 262 F.Supp.3d at 1340, n.6 (S. D. Fla. 2017); see also, Rivera v. Spirit

Airlines, Inc., 2020 WL 491454, at *2 (S.D. Fla. January 30, 2020).

Finally, and particularly instructive during any attempt to determine the

ultimate outcome on the matter, each court considering whether the Act is entitled

to a liberal versus a strict construction has deemed the former appropriate, in light

of the clearly stated remedial purpose of the Act. The Florida Legislature enacted

the Act "to protect private employees who report or refuse to assist employers who

violate laws enacted to protect the public," Golf Channel v. Jenkins, 752 So. 2d 561,

562 (Fla. 2000). It is "to be construed liberally in favor of granting access to the

remedy." Molenda v. Hoechst Celanese Corp., 60 F.Supp. 2d 1294, 1299 (S.D. Fla.

1999); Aery, 118 So. 3d 904 (Fla. 4th DCA 2013) (holding that the Florida

Whistleblower Act is remedial in nature and should be construed liberally in favor of granting access to the remedy so as not to frustrate the legislative intent); Schultz v. Tampa Elec. Co., 704 So. 2d 605, 606 (Fla. 2d DCA 1997) (finding that courts are "required to construe the whistle blower act liberally because it is a remedial statute."). Thus, this Court should follow Aery, and require only that Plaintiff have a good faith, reasonable belief that she was reporting on violations of laws, rules, or regulations.

Defendant then identifies four acts of protected reporting occurring prior to her demotion: 1) the request to falsify documents on November 30, 2018, related to a wound assessment; 2) the December 28, 2018 reports about Shriver's inappropriate sexual conduct; 3) the January 22, 2019 reports about Ray's attempt to bribe staff to take her online English course; and the June 11, 2019 reports to both Ray and AHCA regarding an injured patient. Defendant argues that none of these reports relate to an "actual" violation of law and are thus not actionable. As shown above, Plaintiff need only have a good faith, reasonable belief that her reports pertained to violations of laws, rules, or regulations, which the record before this Court establishes. Defendant does not dispute that these reports took place, only that they reports do not pertain to "actual" violations of law. Thus, following Aery, Plaintiff has established the first element of her *prima facie* proffer, that she engaged in protected activity.

Defendant then argues once again that Plaintiff did not experience an adverse action because she allegedly requested her own demotion. Plaintiff has addressed this issue fully above, at both subsections A and B.

Finally, Defendant argues that Plaintiff cannot establish causation or that her protected activity was the "but for" cause of her demotion. Plaintiff addressed the "but for" standard above, and that response applies here. As for causation, the law cited above applies to whistleblower actions, and the facts here support a finding of causation. Just two weeks after making her report to Ray and AHCA about patient neglect, Plaintiff received an unjustified disciplinary action. She then scheduled surgical leave, and at the very first opportunity to take action against Plaintiff, Defendant demoted her. See Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004) (holding that plaintiff made prima facie case despite lapse in time in that jury could reasonably conclude failure to hire was the first opportunity to retaliate); Porter v. California Dep't of Corr., 419 F.3d 885, 895 (9th Cir. 2005) (temporal delay due to fact that harasser unable to exact retaliation until promotion to supervisory position); Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997) (stating that temporal gap may be explained through "valid reasons" that do not disprove causation). There is also evidence that management and administration did not look favorably on Plaintiff's "by the book" ways, and that her judgment was often undermined or disregarded in front of staff and subordinates alike. A reasonable jury

could thus find, based on these facts, that Plaintiff's protected reports were the cause of her demotion, and summary judgment must be denied.

## III.    Defendant's Proffered Explanation for Taking Action against Plaintiff is Nothing More than a Pretext for Illegal Retaliation.

To show pretext, Plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision… [Plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). In evaluating a summary judgment motion, the district court must evaluate whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir.1997). "[A] plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." Howard v. BP Oil Co., 32 F.3d 520, 526 (11th Cir.1994) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993)); see also, Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1088 (11th Cir. 2004) (stating plaintiff must produce "sufficient evidence to allow a

rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal discrimination.").

Here, Defendant's primary argument is that Plaintiff herself requested the demotion. This is false. Plaintiff initially inquired about a demotion following her mother's fall but decided to remain in her Unit Supervisor position. Although Defendant repeatedly states that Plaintiff only intended to do so until a floor nurse position became available, the text messages offer no such language. As the facts must be viewed in a light most favorable to Plaintiff, Defendant's insistence that Plaintiff requested her own demotion fails.

Moreover, within two weeks of her report to Ray and AHCA and just one day after her report to Ray about her BRCA1 gene mutation, Ray issued Plaintiff unjustified discipline, to which Plaintiff prepared a detailed rebuttal establishing her innocence. See e.g., Wichmann v. Bd. of Trs. of S. Ill. Univ., 180 F.3d 791, 805 (7th Cir. 1999) ("[A] defendant cannot escape the fact that a jury must use its good common sense in addressing how much, if at all, the foolishness or unfairness of the employer's decision weighs in the evidence of pretext."); see Metzler v. Fed. Home Loan Bank of Topeka, 464 F. 3d 1164, 1177 (10th Cir. 2006) (citing cases for the proposition that "suspicious timing ... of documentation - after the fact and in anticipation of litigation - reasonably gave rise to an inference of pretext").

The very day she returned to her Unit Supervisor position, for which she was medically cleared, Defendant demoted her to floor nurse, for which she was not medically cleared. Plaintiff testified, and others have confirmed, that Ray, Mathieu, and Anderson knew that Plaintiff had received the BRCA1 diagnosis and that was the basis for her surgeries. There is also evidence that Ray openly discussed demoting Plaintiff in an attempt to get her to quit.

Because Plaintiff did not quit, she was subjected to ongoing name-calling, such as "hoe bag," "hoochie mama," and "cancer chick." Ray also spread vicious rumors about Plaintiff, telling employees that she was not on medical leave but was instead having a "boob job" and did not have an actual medical concern. This harassment continues even now, where Defendant's counsel insinuated that Plaintiff's concerns were cosmetic, because she had not yet had the final mastectomy. Ray and administration actually harassed Plaintiff to such an extent that she sought an overnight nursing role to get away from them regardless of how negative the health implications would be for her.

If the Court views this evidence in a light most favorable to Plaintiff, the pattern of discrimination and retaliation becomes clear. A reasonable jury could easily conclude, based on this record, that Defendant discriminated against Plaintiff based on her disability and retaliated against her for her reports protected under the

ADA and her whistleblowing activity under Chapter 448, Florida Statutes. Summary judgment must be denied.

## CONCLUSION

Disputed issues of material fact remain which must be resolved by the jury. Thus, for the foregoing reasons, Defendant's Motion for Summary Judgment should be denied.

WHEREFORE, Plaintiff respectfully requests that this Court deny Defendant's Motion for Summary Judgment.

Respectfully submitted,

*/s/  Erika E. Goodman*_____
Erika E. Goodman [FBN 0060951]
MARIE A. MATTOX, P.A.
203 North Gadsden Street
Tallahassee, FL 32301
Telephone: (850) 383-4800
Facsimile: (850) 383-4801
Email: erika@mattoxlaw.com
ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF COMPLIANCE

I hereby certify that in accordance with Fed. R. Civ. P. 56 and N.D. Local Rule 7.1, the memorandum contains 7017 words.

*/s/  Erika E. Goodman*_____
Erika E. Goodman

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing response was conveyed via the Florida Courts e-filing portal to all counsel of record on this 4th day of October 2022.

*/s/  Erika E. Goodman*_____
Erika E. Goodman